SIEGERT v. GANDOLFI et al.

(Circuit Court of Appeals, Second Circuit. December 4, 1906. On Rehearing, January 7, 1907.)

No. 34.

1. TRADE-MARKS—GEOGRAPHICAL NAMES—ANGOSTURA BITTERS.

Complainants adopted the name "Angostura" as the name of bitters originally manufactured by them in the town of that name in Venezuela, and continuously used the same thereafter, though the name of the town was subsequently changed. Complainants' bitters became widely and favorably known under such name. *Held*, that complainants were entitled to protection in the use of the name as against persons using it to create dishonest competition, though complainants could not obtain a monopoly in the use of the word as a trade-mark.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, §§ 78–82.

Use of geographical names, see notes to Hoyt v. J. T. Lovett Co., 17 C. C. A. 657; Illinois Watch-Case Co. v. Elgin Nat. Watch Co., 35 C. C. A. 242.]

2. SAME—UNFAIR COMPETITION—IMITATION OF PACKAGES.

Where defendants imitated both the name and bottles in which complainants' "Angostura" bitters were sold, the labels being similar, except that they disclosed the fact that defendants' bitters were made in Baltimore, Md., instead of Port of Spain, in Trinidad, where com-

plainants' bitters were made, defendants were guilty of unfair competition.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, § 83.]

**3. SAME—RIGHT TO PROTECTION—FRAUDULENT REPRESENTATION.**

Complainants manufactured and sold "Angostura" bitters under representations that it consisted of a mixture of certain bitter, aromatic, and carminative substances, together with alcohol added as a preservative solvent, and that the bitters did not contain any "intoxicating ingredients." An advertising circular contained certificates of physicians and customers, representing that the bitters were a valuable remedy for nearly all ills, and when mixed with water, beer, wine, and spirits, made a "splendid drink," and also that the bitters were free from dangerous ingredients and might be used by invalids, adults, and children to advantage. *Held*, that the statement that the bitters contained no intoxicating ingredients should be construed as referring to the herbs and simples of which it was composed, and that such representations were not so false and fraudulent as to deprive complainants of relief in a suit to enjoin unlawful competition.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, § 94.]

Appeal from the Circuit Court of the United States for the Southern District of New York.

For opinion below, see 139 Fed. 917.

Arthur Furber and Robert C. Morris (William M. Copeland, of counsel), for appellant.

J. B. Leavitt, for appellees.

Before WALLACE, TOWNSEND, and COXE, Circuit Judges.

WALLACE, Circuit Judge. Notwithstanding the voluminous record and the elaborate briefs by which the controversy between the parties has been presented, the controlling questions of fact and law are few and simple, and permit the case to be briefly disposed of.

The action was brought by the sons and successors in business of Dr. J. G. Siegert, who was the original manufacturer of an aromatic bitters which became known as "Angostura Bitters," to restrain the defendants from selling a preparation made by C. W. Abbott, and put upon the market under the same name, in bottles and wrappings in imitation of those previously adopted by the Siegerts. The action was defended by Abbott, and may be treated as though it had been brought against him. The court below dismissed the bill of complaint upon the grounds that the Siegerts never acquired any right to use the name as a trade-name or trade-mark, that they had been guilty of fraudulent misrepresentations in offering their preparation to the public, and that Abbott had not committed any acts of unfair competition.

It appears that Dr. Siegert, a physician and surgeon, compounded and commenced the manufacture and sale of his bitters some years prior to 1846 at Angostura, a seaport town of Venezuela. In 1846 the name of the town was officially changed from "Angostura" to that of "Cuidad Bolivar." Nevertheless, the former name also survived, and the town has ever since been commercially designated to some extent by the original name. The bitters were originally sold under the name of "Dr. Siegert's Aromatic Bitters." In 1853 they began to command an extensive sale in foreign countries, and were common-

ly styled by dealers as "Angostura Bitters," doubtless because they originated at Angostura. By 1868 the name "Angostura Bitters" had come to signify in all parts of the world the bitters which had been and were then prepared and sold by Dr. Siegert and his son; and the name had been adopted by the Siegerts as one of the trade-names for their article. Between 1868 and 1872 it was used by them in their circulars to the trade and their advertisements to the public. In 1872 it was registered in the Patent Office under the law then in force by their agent for this country as a trade-mark for their bitters; and about this time it was used upon the labels of their bottles as the prominent trade-name of their bitters. In the meantime there had been some sporadic instances of imitation by others, but what had become known the world over as "Angostura Bitters" were the bitters of the Siegerts. In 1870 Dr. Siegert died. In 1872 another of his sons was taken into the firm, and in 1875 the firm moved their factory from Cuidad Bolivar to Port of Spain, in the Island of Trinidad.

Abbott, who as has been said is the real defendant, claims to derive his right to use the name, which had thus been adopted as the tradename of the Siegerts, through the firm of Maynard & Co., who in the fall of 1872 began making bitters and putting them on the market under the name of "Angostura Aromatic Bitters." This firm put up their bitters in bottles of the same size and shape of the Siegerts' bottles, sometimes using second-hand Siegert bottles; and they wrapped the bottles in labels which were obviously designed to imitate the Siegert labels in their conspicuous features. In 1877 Abbott registered the name "Aromatic Angostura Bitters" as a trade-mark for the bitters. Subsequently in putting them on the market he dropped the word "Aromatic," and has since in his labels, circulars, and advertisements styled them "Angostura Bitters." Neither Maynard & Co. nor Abbott have ever directly represented that their bitters were the Siegert preparation, and they have always stated in their labels and advertisements that their bitters were manufactured by themselves at Baltimore. Nevertheless, we are satisfied that they used the name and simulated the Siegerts' bottles and labels to confuse the identity of their bitters with those of the Siegerts' preparation, and to lead the public to believe that in buying theirs they would be buying those originally made and sold by the Siegerts. In order to justify the use of the word "Angostura," they employed as one of the ingredients of their bitters a trifling infusion of Angostura bark.

The case is essentially in its facts like one which was considered by the Circuit Court of Appeals of the Seventh Circuit in Bauer & Co. v. Siegert, 120 Fed. 81, 56 C. C. A. 487, which was a bill in equity by the Siegerts to enjoin Bauer & Co. from unfair competition in using the word "Angostura," and from simulating their labels and the dress upon the bottles, and in which it was contended that the word "Angostura" could not be the subject of a trade-mark or a trade-name. But the court sustained the bill, and enjoined the acts complained of.

Undoubtedly the Siegerts did not, and could not, acquire such a monopoly in a geographical name as a trade-mark or trade-name as would entitle them to prevent others from using it under any circumstances. But it is sufficient to entitle them to relief that they used

the name lawfully to designate their product until it became known to the trade by that designation, that by doing so they acquired a trade which was valuable to them, and that their business is being injured by acts of the defendants which create a dishonest competition by leading the public to believe that Abbott's bitters are the original bitters. This has long been the law in this circuit (Anheuser-Busch Brewing Association v. Piza [C. C.] 23 Blatch. 245, 24 Fed. 149), and has always been adhered to in this court. When the name of a place or a locality has been so long applied as a descriptive designation of the product of some manufacturer there that it has acquired a secondary meaning, and has come to be generally recognized in trade as signifying his particular product, it becomes so far his property that a business rival cannot appropriate and use it to induce purchasers to buy a product made elsewhere, or even made at the same place. This proposition is so well settled that any citation of authorities would be superfluous, but the case of French Republic v. Saratoga Vichy Spring Co., 191 U. S. 427, 24 Sup. Ct. 145, 48 L. Ed. 247, may properly be referred to. The syllabus in that case is as follows:

"Geographic names often acquire a secondary signification indicative not only of the place of manufacture but of the name of the manufacturer or producer, and the excellence of the thing manufactured or produced, which enables the manufacturer or owner to assert an exclusive right to such name as against every one not doing business within the same geographical limits; and even as against them, if the name be used fraudulently for the purpose of misleading buyers as to the actual origin of the thing produced or palming off the productions of one person as those of another."

If the geographical name has become a secondary designation indicative of the product of the particular manufacturer, it is as much entitled to protection as any arbitrary or fancy name which he might have selected; and the circumstance that the manufacturer may have removed his place of business, and is making his product in some other place, is of no more consequence than it would be if he had adopted the fancy name.

The court below was impressed that the Siegerts had been guilty of fraud in misrepresenting the therapeutic qualities of their bitters, and especially in falsely representing that they were free from all intoxicating ingredients. We cannot assent to these conclusions. The misstatements referred to are mainly contained in certain certificates of physicians and chemists embodied in an advertising circular issued by the Siegerts. Some of these certificates depict the bitters as a valuable remedy for nearly all the ills that flesh is heir to; but the extravagance of their laudations is sufficient to deprive them of any weight in the minds of those who read the more careful statements in the certificates which accompany them. Representations that the bitters when mixed with water, beer, wine, and spirits make a "splendid drink," that they are free from admixture with the dangerous ingredients "so commonly present in what are termed 'pick-me-ups,'" and are a useful, hygienic liqueur "that may be used by invalids and those in good health, by adults and children, with equal advantage," are hardly a sufficient basis for a charge of fraud. Medical experts have testified to the substantial truth of the statements; and it is not un-

reasonable to suppose that the Siegerts themselves came to believe that their own production which had acquired an unexampled popularity in all parts of the world was as remarkable in its curative properties as some of the chemists and physicians certified. The statement that the bitters did not contain "any intoxicating ingredients" evidently refers to the herbs and simples of which it was composed, as the accompanying statement is:

"They consist of a mixture of certain bitter, aromatic and carminative substances, together with alcohol, added as a preservative and solvent."

The defense of unclean hands comes with ill grace from a rival manufacturer who advertises his article in equally glowing and exaggerated terms, stating among other things that his bitters are "unequaled as a cure for liver complaint, dyspepsia, fever and ague, bilious, intermittent and remittent fevers," and "a sure remedy against Asiatic cholera and yellow fever."

Upon the whole case we are of the opinion that the complainants were entitled to an injunction restraining the defendants from using the word "Angostura," and from imitating complainants' labels and the dress upon their bottles, and to an accounting.

The decree is therefore reversed, with costs, and with instructions to the court below to decree conformably with this opinion.

### On Motion for Rehearing.

PER CURIAM. In view of the fact that the opinion expressly states that the case is considered precisely as if it were brought against Abbott, we see no reason for the assumption, which is the basis of this application by the nominal defendants, that they are charged with dishonorable conduct. The motion is denied.